2011 Ark. App. 540

**Johnnie WILLIAMS, Appellant**

v.

**HOT SPRINGS EXCAVATING CO. and EMC Ins. Co., Appellees.**

**No. CA 11–40.**

Court of Appeals of Arkansas.

Sept. 14, 2011.

Shannon Muse Carroll, Hot Springs, for appellant.

WAYMOND M. BROWN, Judge.

Appellant Johnnie Williams appeals from a decision of the Arkansas Workers' Compensation Commission (Commission) denying the compensability of his back injury. Williams argues on appeal that the Commission failed to perform a proper de novo review of the record, which resulted in it making erroneous factual findings upon which it expressly relied in reaching its decision. We affirm.

The administrative law judge (ALJ) determined that Williams failed to prove that he suffered a work-related injury to his back on July 7, 2009. The Commission, after performing a de novo review, adopted and affirmed the opinion of the ALJ. This appeal followed.

When an appeal is taken from the denial of a claim by the Workers' Compensation Commission, the substantial-evidence standard of review requires that we affirm the decision if the Commission's opinion displays a substantial basis for the denial of relief.[1] In determining the sufficiency of the evidence to support the findings of the Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if those findings are supported by substantial evidence.[2] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[3] It is the Commission's function to determine the credibility of witnesses and the weight to be given their testimony.[4] Further, the Commission has the authority to accept or reject medical opinions, and its resolution of the medical evidence has the force and effect of a jury verdict.[5]

Williams had worked as a heavy equipment operator for appellee Hot Springs Excavating Company (HSEC) since 1991. Williams allegedly suffered a back injury while performing excavating work on July 7, 2009, on the property of Chester Shaw. Williams was seen by nurse practitioner Jacqueline Laper on July 13, 2009. The progress notes from that date indicate that Williams presented complaining of "excruciating left hip pain," which started "about a week and a half ago." The note further stated that there was no history of injury and that Williams had "been having intermittent numbness in his left hand and foot since 12/08." Williams was assessed with left-hip pain with no known injury. Williams was given pain medication and told that if there was no resolution in his pain, he may need to be hospitalized. Williams returned on July 14 stating that the pain medication he received the day before did not work and that he could not take the pain. He also complained of nausea. He was subsequently hospitalized at HealthPark Hospital. The pre-admission history indicated that Williams suffered from left-hip pain after being on a track-hoe all day approximately a week and a half ago. The history also stated that Williams denied any back pain. An MRI was performed on Williams's back, which showed left foraminal disc herniation at L4–5 with effacement of the left L4 nerve

1. *McDonald v. Batesville Poultry Equip.*, 90 Ark.App. 435, 206 S.W.3d 908 (2005).

2. *Id.*

3. *Id.*

4. *Whitten v. Edward Trucking/Corporate Solutions*, 87 Ark.App. 112, 189 S.W.3d 82 (2004).

5. *Estridge v. Waste Management*, 343 Ark. 276, 33 S.W.3d 167 (2000).

root sheath and probable small annular tear at L5–S1.

Williams presented to Dr. Michael Young on July 16, 2009, with complaints of back and leg pain. Dr. M. Young opined that Williams might benefit from surgical intervention. Williams saw Dr. Andrew Young on July 17, 2009. Dr. A. Young planned to continue treating Williams conservatively. However, Dr. A. Young indicated that if conservative treatment failed to provide Williams with relief, surgery would be the next step. Dr. James Arthur performed surgery on Williams's back on July 23, 2009. Dr. Arthur released Williams to work as of August 31, 2009.

Williams testified that on July 7, 2009, at approximately 3:30 p.m., he was on an incline clearing brush that had previously been cut down by loggers. He said he put the D–5 dozer he was operating in reverse and hit a stump approximately three-feet tall. Williams stated that the dozer came to a "dead stop," and he immediately felt a sharp pain in his back. He described the pain as "like a knife sticking in [his] back." Williams stated that he got off of the dozer and "kind of stood there" to make sure he was not hurt badly. He said that he thought he was experiencing the normal aches and pains that come with running heavy equipment. Williams stated that he decided against telling anyone about his injury because if he went home, he would not get paid. He said that he got his trackhoe, dug up the stump, and put it in the pile of brush that he had made. He testified that he finished work that day; however, he said that when he got home, he took an aspirin and placed a heating pad on his back. Williams stated that he finished out his work week (Monday–Thursday), even though it felt as if his back pain "progressed into something worse." He testified that on Friday, July 10, he could hardly move. He called his doctor, Dr. Andrew Grose, and was prescribed some pain medicine by the nurse practitioner to last him throughout the weekend. Williams said that the medicine did not help his pain so he decided to go see the nurse practitioner on Monday, July 13.[6] He testified that the practitioner, Jacqueline Laper, was the first person he told about his accident. He also stated that she wrote down everything he told her. Williams said that on July 14, 2009, while he was in the hospital, he called Lloyd Wynn[7] and informed him about the injury. According to Williams, Wynn came to see him immediately. Williams also stated that Wynn filled out his paper work concerning the injury.

On cross-examination, Williams stated that he filed a workers' compensation claim when he injured his ankle in 1997 while working for HSEC. He said that he was seen at "some little day clinic" that same day. He acknowledged that he was "familiar with how to process a workers' comp claim." Williams testified that he went to Wynn's office on Thursday night, July 9, 2009, to pick up his check. He continued,

> When I went into his office I didn't say anything about the injury as far as the injury goes, but I went to sit down and talk to [Wynn] and I said "[Wynn], I can't sit down." He said something to the effect of "I understand" or something like that, I walked out, went and cashed my check and went home. I didn't mention my injury.

Williams stated that he never mentioned his injury to Shaw. Williams conceded that even though he had Wynn's and Shaw's

---

6. The doctor was out of the office on July 10 and July 13.

7. The boss of HSEC.

phone numbers, he never called to inform them about his injury prior to July 14, 2009. Williams denied telling Dr. Grose's nurse practitioner on July 13, 2009, his pain started a week and a half ago. Williams stated that he took the stump out after he hit it because he did not want anyone else to get hurt.

Wynn testified that he is Shaw's son-in-law and the vice president of HSEC. He stated that even though business is slow, the company has kept Williams on because he is a good worker. Wynn also said that he had found Williams to be a truthful person in the past.

On cross-examination, Wynn stated that he was not present on July 7, 2009, when Williams allegedly injured his back. On redirect, Wynn stated that he did not remember Williams complaining about having difficulty with his back before July 7. He also said that he has had compression fractures and that he could not drive heavy equipment with the fractures.

On re-cross, Wynn testified that Williams had said something to him about back trouble he was having at the time, but Williams never referred to any injury he had sustained. He also stated that he did not remember Williams mentioning to him that he backed over a stump. According to Wynn, he would have sent Williams for treatment if Williams had reported an injury to him. Wynn said that he learned of Williams's injury after Williams had already been admitted to the hospital. On redirect, Wynn said that Williams said something to him on Thursday night about his back being stiff but that he could not remember if he asked Williams any questions about his back.

Wynn told the ALJ that before Thursday night, Williams had not complained about any physical problems with his back that Wynn could recall. Wynn stated that Williams called him on July 14, 2009, say-ing that he wanted to fill out a workers' compensation claim for an injury he suffered the previous week. Wynn testified that he went straight to First Arkansas to pick up the forms and went to the hospital where Williams was. Wynn stated that Williams was in a lot of pain when he was at the hospital with Williams. According to Wynn, Williams told him that he was operating a bulldozer and backed over a stump with one of the tracks causing his injury. Wynn said that he took the completed form back to First Arkansas who submitted it to appellee EMC. Wynn testified that he did not know whose decision it was to dispute Williams's claim.

On re-cross, Wynn stated that Williams told him that his injury took place in the morning and that was why he put morning on the form. Wynn said that Williams had access to call him if Williams needed to report a work-related injury.

On redirect, Wynn stated that he went to work for HSEC as a laborer and worked as a heavy-equipment driver. According to Wynn, "[t]here are days when you get off of one of those things and your back hurts and you think it is going to get better."

On re-cross, Wynn testified that if the form stated that Williams "backed up, ran over stump, and jarred on landing," that was what Williams told him.

Shaw testified that he was the previous owner of HSEC. He stated that in July 2009, Williams was on his property repiling some brush so that Shaw could burn it. Shaw stated that he had daily contact with Williams and denied that Williams ran a bulldozer. According to Shaw, Williams was not physically able to run a bulldozer so he had to run an excavator. Shaw testified that he was present on July 9 and that Williams did not say anything to him about hurting his back that day.

Shaw stated that he observed that Williams had been stopping the trackhoe all day long and went to Williams to see what was wrong. According to Shaw, Williams told him that he was taking aspirin and that he had to stop and walk around "every so often." Shaw stated that when he asked Williams what was wrong with him, Williams replied "I got that Ulm disease my dad had." Shaw testified that he did not ask Williams what he meant by that. However, he stated that Williams did not indicate any problem with his back. He also said that Williams did not say anything to him about backing over a stump. Shaw testified that there were no stumps on his property because that property had been completely cleared. Shaw stated that he would have taken Williams to the clinic if Williams had come to him and told him about a back injury. Shaw said that there were no stumps on his property close to three-feet tall. Shaw testified that Williams never would have backed into a stump that high because he would have seen it.

On cross-examination, Shaw testified that there are a couple of small stumps on his property that are about four-to-six inches tall. He stated that after Williams reported an injury, he attempted to find a stump on the brush pile and could not. Shaw said that he walked around the brush piles and looked at them

On redirect, Shaw stated that if Williams had backed a trackhoe or bulldozer over even a six-inch stump, he would have been jarred "pretty hard" and would have nearly been thrown out. He also said that if a three-foot stump had been removed, he would expect to see evidence of it. According to Shaw, there would be holes in the ground after rain. However, he stated that there are no holes in the ground.

Williams was recalled and on redirect, he stated that his father did not have any back problems. He said that his father died from high blood pressure. Williams testified that he was not trying to shake out his back on July 9 but that he was only trying to rest some. He acknowledged that he told Shaw that he had the same disease his father had but insisted that his father did not have any long-term back disease. Williams stated that he was hoping that the back pain he experienced on July 7 would resolve.

On re-cross, Williams stated that the pain he experienced on July 7 was about the same as the pain he had previously experienced while operating heavy equipment, just deeper. He said that he did not know that he was injured that badly. Williams testified that he worked full days the Wednesday and Thursday following his injury.

Williams told the ALJ that he put the good dirt back and packed it after he removed the stump so that there would not be any holes left on the property.

■ The ALJ issued an opinion on July 10, 2010, denying Williams benefits. The ALJ noted that Williams did not give a history of a work-related injury to any of his initial medical providers. The ALJ also noted that Williams did not inform his employer of any injury until after he was hospitalized and an MRI revealed a herniated disc. The ALJ found Williams's course of conduct to be inconsistent with his claim in that Williams failed to inform his employer of his injury even though he saw Wynn two days after the alleged injury, and he failed to inform Shaw about his injury, claiming only to have the same disease his father had. The ALJ stated that Williams's statement to Shaw indicated a pre-existing condition. Williams appealed to the Commission. The Commission affirmed and adopted the decision of

the ALJ in an order filed December 2, 2010. This appeal followed.

In its ruling, Commission stated that it had conducted a de novo review of the record and found that the ALJ's findings of fact and conclusions of law were correct, and specifically adopted those findings. When the Commission affirms and adopts the ALJ's opinion, we consider both the ALJ's decision and the Commission's majority opinion.[8] Here, the ALJ made factual findings regarding the evidence presented during Williams's hearing, including the testimony and medical evidence. Based on our review, we conclude that the findings of the ALJ were sufficiently detailed to allow us to determine if the Commission decided the case in accordance with the law. We find no error.

Affirmed.

PITTMAN and GLADWIN, JJ., agree.

8.  *Fayetteville Sch. Dist. v. Kunzelman,* 93 Ark. App. 160, 162, 217 S.W.3d 149, 151 (2005).